DANIEL Z. STERN,

Plaintiff,

VERSUS

OXFORD HEALTH PLANS, INC.,

Defendant.

———————————

**MEMORANDUM AND ORDER**
July 17, 2013

———————————

JOSEPH F. BIANCO, District Judge:

Plaintiff Daniel Z. Stern ("plaintiff" or "Stern"), individually and as Parent and Natural Guardian of Sasha Stern ("Sasha"), brought this action against Oxford Health Plans, Inc. ("defendant" or "Oxford") alleging that defendant violated the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001 *et seq.* by failing to provide his minor son Sasha with benefits that he claims Sasha is entitled to under his employer's employee welfare benefit plan (the "Plan"). In particular, plaintiff alleges that defendant's determination that Sasha's growth hormone treatment was not "medically necessary" to treat his congenital adrenal hyperplasia ("CAH") was arbitrary and capricious, and therefore, a violation of ERISA.

Presently before the Court are defendant's motion for summary judgment and plaintiff's cross-motion for summary judgment, both made pursuant to Federal Rule of Civil Procedure 56. For the reasons set forth below, the Court grants defendant's motion for summary judgment and denies plaintiff's cross-motion for summary judgment. Specifically, the Court concludes that no rational factfinder could determine that the defendant's denial of plaintiff's claim was arbitrary and capricious because: (1) the Plan, through its guidelines, explicitly bars coverage for treatment of short stature associated with CAH; (2) Oxford's reviewing doctors, including a Board Certified endocrinologist consultant retained by Oxford, concluded that the use of growth hormone therapy in children with CAH is not medically necessary; and (3) although Sasha's treating physician concluded (with no detailed findings) that the treatment was medically necessary, there are no studies or other evidence in the record suggesting that growth hormone treatment has been proven to be effective in treating

CAH, nor has the FDA approved this treatment for CAH.

I. BACKGROUND

A. Factual Background

1. Sasha's Medical Condition

Sasha is a fifteen-year-old suffering from CAH. (Compl. ¶ 15.) According to plaintiff, CAH is "characterized by an enzyme deficiency, resulting in the inability of the adrenal glands to make certain essential hormones." (*Id.*) CAH may cause premature rapid growth in children; however, the result is short adult height. (*Id.*) In order to treat this condition and allow Sasha to achieve his expected normal growth, Sasha has been under the treatment of Elizabeth Wallach, M.D. ("Dr. Wallach"), a Board Certified Endocrinologist specializing in pediatric endocrinology. (Pl.'s 56.1 ¶ 2.)[1] Dr. Wallach diagnosed Sasha with "precocious sexual development and puberty" in April 2009 when he was ten-years-old (R. at 321)[2], and diagnosed him with CAH one month later (*id.* at 303). In late 2009 and early 2010, Sasha was being treated with glucocorticoid replacement therapy and GnRH agonist therapy to suppress central puberty. (*Id.* at 301, 303.)

2. The Plan

Plaintiff, by virtue of his employment, is a participant in the Plan. (Def.'s 56.1 ¶ 2.) Oxford, the insurer for the Plan responsible for the administration of benefits, provided both plaintiff and Sasha with health insurance coverage. (Compl. ¶ 10.) Oxford both evaluates claims and pays benefits on claims (*see, e.g.*, Def.'s Mem. at 1), and the Plan gives Oxford the discretion to determine benefits (*see* R. at 15 ("Based on Our Medical Policies, We reserve the right to provide benefits in the manner, and to the extent, We believe is Medically Necessary.")). The Plan also grants Oxford the right to "adopt reasonable policies, procedures, rules and interpretations to promote the orderly and efficient administration of this Certificate with which Members shall comply." (*Id.* at 43.)

The Plan provides benefits for "Covered Services," but only when the service is "Medically Necessary" and "Not excluded under this Certificate[] and Not in excess of the benefit limitations described in this Certificate or your Summary of Benefits." (Def.'s 56.1 ¶ 3.) The Plan defines Medically Necessary as:

> health care services that a health care provider, exercising his prudent clinical judgment, would provide to a Member for the purpose of evaluating, diagnosing or treating an illness, injury, disease or its symptoms and that is in accordance with the generally accepted standards of medical practice:
>
> • clinically appropriate, in terms of type, frequency, extent, site and duration, and considered effective for the covered person's illness, injury or disease;

---

[1] Where the parties' Rule 56.1 Statements contain specific citations to the record to support their statements or where the statement is admitted by the opposite party, the Court has cited to the Rule 56.1 Statements, rather than to the underlying citation in the record.

[2] "R." is a citation to the Administrative Record, which is annexed to the Declarations of Rodney Lippold, Maryann Britto, and Crystal B. Irby-Soares. All page numbers refer to the Bates Stamped pages starting with the prefix "STERN000___."

- not primarily for the convenience of the covered person or the health care provider; and

- not more costly than an alternative service or sequence of services at least as likely to produce equivalent therapeutic or diagnostic results as to the diagnosis or treatment of that covered person's illness, injury or disease.

(R. at 94.)[3] The Plan also excludes coverage for experimental or ineffective treatments. (Def.'s 56.1 ¶ 8.)

To assist with the consistent administration of the Plan, Oxford adopted a "Growth Hormone Replacement Therapy Guideline," also known as Corporate Policy, PHARMACY 114.17 ("GHRT Guideline"), which states that growth hormones are covered under the Plan but that the benefit requires pre-certification from Oxford. (R. at 287.) However, the GHRT Guideline states that growth hormone therapy is not covered for certain conditions "associated with either short stature or non-optimum attainment of height due to the presence of an additional clinical entity or disease" because such treatment "is still considered experimental in nature." (*Id.* at 291-92.) The GHRT Guideline specifically lists CAH as a condition that may not be treated with growth hormone therapy under the Plan.[4] (*Id.* at 292.)

The Plan also contains an Outpatient Prescription Drug Rider (the "Prescription Drug Rider"). The Prescription Drug Rider states that "the cost of Medically Necessary Prescription Drug Products will be Covered at a Network Pharmacy." (R. at 104.)

3. Denial of Benefits

To receive authorization for a prescription for Sasha, Dr. Wallach prepared a "Statement of Medical Necessity for Pediatric Growth Hormone Treatment" form on October 25, 2010. (*Id.* at 323.) In this form, Dr. Wallach attested that growth hormone treatment was medically necessary but she failed to specify which specific drug she planned to prescribe. (*Id.*) On November 8, 2010, Dr. Wallach submitted an Initial Request for Growth Hormone Therapy form, requesting authorization for Nutropin AQ. (*Id.* at 299.) Dr. Wallach listed Sasha's primary diagnosis as "short stature." (*Id.*)

---

[3] Defendant asserts in its Rule 56.1 statement that the definition of Medically Necessary is as follows:

Services or supplies as provided by a Hospital, Skilled Nursing Facility, Physician or other provider required to identify or treat your illness or injury and which, as determined by Our Medical Director, are:

1. Consistent with the symptoms or diagnosis and treatment of your condition;
2. Appropriate with regard to standards of good medical practice;
3. Not solely for your convenience or that of any provider; and
4. The most appropriate supply or level of service which can safely be provided. For inpatient services, it further means that your condition cannot safely be diagnosed or treated on an outpatient basis.

(Def.'s 56.1 ¶ 7.) However, this definition of Medically Necessary was "deleted in its entirety and replaced" in October 2006 with the definition quoted in the main text of the Court's opinion. (R. at 94.) In any event, the definitions do not appear materially different as they relate to the facts of this case, and plaintiff does not argue that one of the definitions is more favorable to his position.

[4] Although not contained anywhere in his papers, plaintiff's counsel asserted at oral argument for the first time that the GHRT Guideline was expired because it states that it was "archived" on December 1, 2010. (R. at 287.) However, the mere existence of the word "archived" on a document is insufficient to demonstrate that the document is no longer in effect, and there is simply no evidence in the record to support this belated contention.

Dr. Wallach also noted that Sasha was currently taking Lupron. (*Id.*) Dr. Wallach enclosed Sasha's clinical records with this form. (Def.'s 56.1 ¶ 16.)

By letter dated November 19, 2010, Oxford advised Sasha that his claim for coverage for growth hormone therapy had been denied because Oxford's Medical Director had determined that "[t]he use of Luptron [sic] in conjunction with Growth Hormone not associated with a medical condition (such as Growth Hormone deficiency) for the purposes of increasing height is not considered medically necessary and therefore, not covered." (R. at 234.) Although not known to plaintiff at the time, Kathleen O'Connell, M.D. ("Dr. O'Connell"), whom defendant states is a Board Certified endocrinologist consultant retained by Oxford, recommended on November 18, 2010 that the claim be denied for the reasons stated in Oxford's November 19, 2010 letter to Sasha. (*Id.* at 328; Def.'s 56.1 ¶ 23.) On November 19, 2010, Howard Dembin, M.D. ("Dr. Dembin"), an Oxford Medical Director, reviewed Sasha's file and concurred with Dr. O'Connell's recommendation. (Def.'s 56.1 ¶ 24.)[5]

Plaintiff appealed Oxford's decision. By letter dated December 3, 2010, Oxford upheld the denial, advising Sasha that its Medical Director determined that "the use of growth hormone in children with congenital adrenal hyperplasia is not of proven efficacy. It is not considered to be medically necessary." (R. at 239.) The letter noted that this "review was performed utilizing" both the GHRT Guideline and the definition of medically necessary contained in the Plan. (*Id.* at 239.) The letter also advised plaintiff that the Medical Director who participated in this review is a physician with a specialty in family medicine (*id.*), and this litigation revealed the unnamed Medical Director as Brian Rose, DO ("Dr. Rose") (*id.* at 284).

On February 22, 2011, Dr. Wallach submitted a request for a second-level appeal of Oxford's benefits determination. (Def.'s 56.1 ¶ 32.) Dr. Wallach stated that Sasha "is [a] 12 year old boy with NC-Congenital Adrenal Hyperplasia" and that while he is "currently responding" to the glucocorticoid replacement therapy and GnRH agonist therapy to suppress central puberty, along with other medications and treatments, he still has a "subnormal growth rate." (R. at 264.) Dr. Wallach concluded: "We asked [sic] that you reconsider your decision and allow the patient to continue therapy. I do not want to compromise his potential adult height." (*Id.*)

On April 14, 2011, Gail A. Wilder, M.D. ("Dr. Wilder") concurred with the previous determinations and recommended upholding the denial. (*Id.* at 146.) By letter dated that same day, Oxford again denied the benefit as not medically necessary. The letter notified Dr. Wallach that "a panel of physicians consisting of a Medical Director who is Board Certified in Internal/Emergency Medicine and a Medical Director who is Board Certified in Family Medicine" reviewed the appeal and continued to deny coverage because "[g]rowth hormone is not FDA approved for the treatment of congenital adrenal hyperplasia. Its use in this setting has not been shown to be effective." (*Id.* at 251.)

---

[5] Although plaintiff contends that the information regarding Dr. Dembin is not contained in the administrative record, that contention is incorrect. There is an entry in the record for November 19, 2010 that indicates that the claim was denied as not medically necessary and contains the notation "HDEMBI1" in the Medical Director column. (R. at 143.) In any event, the Court's conclusion would be the same even without Dr. Dembin's concurrence.

4

### B. Procedural Background

Plaintiff filed the complaint in this action on May 14, 2012. Defendant answered the complaint on August 8, 2012. On February 28, 2013, defendant filed its motion for summary judgment. Plaintiff filed his opposition and cross-motion for summary judgment on April 15, 2013. Defendant filed its opposition to plaintiff's cross-motion for summary judgment and its reply in support of its motion for summary judgment on May 6, 2013, and plaintiff filed his reply in support of his cross-motion on May 20, 2013. The Court held oral argument on July 11, 2013. The Court has fully considered the parties' submissions.

## II. STANDARD OF REVIEW

### A. Summary Judgment

The standard for summary judgment is well settled. Pursuant to Federal Rule of Civil Procedure 56(a), a court may only grant a motion for summary judgment if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the burden of showing that he or she is entitled to summary judgment. *Huminski v. Corsones*, 396 F.3d 53, 69 (2d Cir. 2005). "A party asserting that a fact cannot be or is genuinely disputed must support the assertion by: (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1). The court "'is not to weigh the evidence but is instead required to view the evidence in the light most favorable to the party opposing summary judgment, to draw all reasonable inferences in favor of that party, and to eschew credibility assessments.'" *Amnesty Am. v. Town of W. Hartford*, 361 F.3d 113, 122 (2d Cir. 2004) (quoting *Weyant v. Okst*, 101 F.3d 845, 854 (2d Cir. 1996)); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) (summary judgment is unwarranted if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party").

Once the moving party has met its burden, the opposing party "'must do more than simply show that there is some metaphysical doubt as to the material facts. . . . [T]he nonmoving party must come forward with specific facts showing that there is a *genuine issue for trial.*'" *Caldarola v. Calabrese*, 298 F.3d 156, 160 (2d Cir. 2002) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986)). As the Supreme Court stated in *Anderson*, "[i]f the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." 477 U.S. at 249-50 (citations omitted). Indeed, "the mere existence of *some* alleged factual dispute between the parties" alone will not defeat a properly supported motion for summary judgment. *Id.* at 247-48. Thus, the nonmoving party may not rest upon mere conclusory allegations or denials but must set forth "'concrete particulars'" showing that a trial is needed. *R.G. Group, Inc. v. Horn & Hardart Co.*, 751 F.2d 69, 77 (2d Cir. 1984) (quoting *SEC v. Research Automation Corp.*, 585 F.2d 31, 33 (2d Cir. 1978)). Accordingly, it is insufficient for a party opposing summary judgment "'merely to assert a conclusion without supplying supporting arguments or facts.'" *BellSouth Telecomms., Inc. v. W.R. Grace & Co.*, 77

F.3d 603, 615 (2d Cir. 1996) (quoting *Research Automation Corp.*, 585 F.2d at 33).

## B. ERISA and Administrative Review

A denial of benefits under ERISA "'is to be reviewed under a *de novo* standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan.'" *Krauss v. Oxford Health Plans, Inc.*, 517 F.3d 614, 622 (2d Cir. 2008) (quoting *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115, (1989)). "If the insurer establishes that it has such discretion, the benefits decision is reviewed under the arbitrary and capricious standard." *Id.*; *see also Celardo v. GNY Auto. Dealers Health & Welfare Trust*, 318 F.3d 142, 145 (2d Cir. 2003) ("The Supreme Court . . . has indicated that plans investing the administrator with broad discretionary authority to determine eligibility are reviewed under the arbitrary and capricious standard."). Here, plaintiff correctly concedes that "[t]he Oxford Plan . . . gives the Plan Administrator discretion to determine benefits . . . ." (Pl.'s Mem. at 11.) Therefore, the Court may only overturn the denial of benefits if defendant's determination was arbitrary and capricious.

In particular, according to the Second Circuit, an administrator's decision is arbitrary and capricious "if it was 'without reason, unsupported by substantial evidence or erroneous as a matter of law.'" *Krauss*, 517 F.3d at 623 (quoting *Fay v. Oxford Health Plan*, 287 F.3d 96, 104 (2d Cir. 2002)). "Substantial evidence is 'such evidence that a reasonable mind might accept as adequate to support the conclusion reached by the [administrator and] . . . requires more than a scintilla but less than a preponderance.'" *Celardo*, 318 F.3d at 146 (alteration in original) (quoting *Miller v. United Welfare Fund*, 72 F.3d 1066, 1072 (2d Cir. 1995)). Thus, "[u]nder the arbitrary and capricious standard, the scope of judicial review is narrow." *Id.*; *see also Miller*, 72 F.3d at 1070 ("When an employee benefit plan grants a plan fiduciary discretionary authority to construe the terms of the plan, a district court must review deferentially a denial of benefits . . . ."); *Lee v. Aetna Life & Cas. Ins. Co.*, No. 05 Civ. 2960, 2007 WL 1541009, at *4, (S.D.N.Y. May 24, 2007) ("Under the arbitrary and capricious standard of review, Aetna's decision to terminate benefits is entitled to deference . . . ."); *Butler v. N.Y. Times Co.*, No. 03 Civ. 5978, 2007 WL 703928, at *3 (S.D.N.Y. Mar. 7, 2007) ("'Under the 'arbitrary and capricious' standard the scope of review is a narrow one. A reviewing court must consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment.'" (quoting *Bowman Transp. Inc. v. Ark. Best Freight Sys.*, 419 U.S. 281, 285 (1974))); *Greenberg v. Unum Life Ins. Co. of Am.*, No. CV–03–1396, 2006 WL 842395, at *8 (E.D.N.Y. Mar. 27, 2006) ("Decisions of the plan administrator are accorded great deference: the court may not upset a reasonable interpretation by the administrator . . . . Accordingly, it is inappropriate in this setting for the trial judge to substitute his judgment for that of the plan administrator." (citations and internal quotation marks omitted)).

## III. DISCUSSION

### 1. Was Oxford Influenced by a Conflict of Interest?

Plaintiff argues that the Court should consider defendant's conflict of interest in evaluating whether the denial of benefits was arbitrary and capricious. For the reasons

set forth below, although there is a structural conflict of interest and the Court has considered it, the Court concludes it should be entitled to little weight because there is no evidence that it affected the reasonableness of Oxford's determination and, further, Oxford took a number of steps to minimize the impact of any conflict. In any event, any weight afforded to that structural conflict is outweighed by all of the other factors supporting Oxford's determination.

The Supreme Court held in *Metropolitan Life Insurance Co. v. Glenn*, 554 U.S. 105 (2008), that in the event the administrator is operating under a conflict of interest, there is no change in the standard of review from deferential to *de novo*. *Id.* at 115-16.; *accord Hobson v. Metro. Life Ins. Co.*, 574 F.3d 75, 83 (2d Cir. 2009). However, when an administrator both evaluates and pays benefits claims, the court "must take [the conflict] into account and weigh [it] as a factor in determining whether there was an abuse of discretion . . . ." *McCauley v. First Unum Life Ins. Co.*, 551 F.3d 126, 133 (2d Cir. 2008); *see also Miles v. Principal Life Ins. Co.*, 12-152-CV, 2013 WL 3197996, *11 n.13 (2d Cir. June 26, 2013) ("In reviewing an administrator's decision under the deferential 'arbitrary and capricious' standard, we remain cognizant of the conflict of interest that exists when the administrator has both the discretionary authority to determine eligibility for benefits and the obligation to pay benefits when due."). A conflict of interest is included as one of several different factors that a reviewing judge must take into account when reviewing a denial of benefits and its weight is in proportion with the "'likelihood that [the conflict] affected the benefits decision.'" *Durakovic v. Bldg. Serv. 32 BJ Pension Fund*, 609 F.3d 133, 139-40 (2d Cir. 2010) (alteration in original) (quoting *Glenn*, 554 U.S. at 117). "[N]o weight is given to a conflict in the absence of any evidence that the conflict actually affected the administrator's decision." *Id.* at 140 (citing *Hobson*, 574 F.3d at 83). "Evidence that a conflict affected a decision may be categorical (such as a history of biased claims administration) or case specific (such as an administrator's deceptive or unreasonable conduct) . . . ." *Id.* (citation and internal quotation marks omitted); *see also McCauley*, 551 F.3d at 138 (evidence led to the conclusion that an administrator was affected by its conflict of interest where administrator ignored a detailed medical report without further investigation while unreasonably relying on a single report that was aligned with its financial interests, had a history of abusive claims processing, and engaged in deceptive practices toward the claimant).

Here, defendant, as both administrator and payer of claims, has a structural conflict of interest because every claim it denies results in higher profits. *See Glenn*, 554 U.S. at 112. Therefore, there is a conflict of interest that the Court must take into account, even if it decides not to give the conflict noticeable weight. *See id.* at 120 (Roberts, C.J., concurring in part and concurring in the judgment) ("The majority's approach would allow the bare existence of a conflict to enhance the significance of other factors already considered by reviewing courts, even if the conflict is not shown to have played any role in the denial of benefits. The end result is to increase the level of scrutiny in every case in which there is a conflict . . . ."); *Fortune v. Grp. Long Term Disability Plan for Emps. of Keyspan Corp.*, 391 F. App'x 74, 79 (2d Cir. Aug. 30, 2010) ("Fortune has adduced no evidence indicating that Hartford has a history of biased claims administration. Nor is the record medical evidence so thin or unsound as to call into question the legitimacy of Hartford's determination of

this particular claim. For the foregoing reasons, we reject Fortune's claim that Hartford's conflict of interest warrants a finding that its decision denying her claim for benefits was arbitrary and capricious."); *Pretty v. Prudential Ins. Co. of Am.*, 696 F. Supp. 2d 170, 189 (D. Conn. 2010) (finding that plaintiff "has presented no evidence to suggest that Prudential may have been, much less was, influenced by the conflict," and stating that "the Court does not believe that Prudential's conflict of interest should be accorded significant weight").

In this case, plaintiff has adduced no specific evidence showing that the conflict of interest affected the reasonableness of the Oxford's determination. For example, unlike in *Durakovic*, defendant did not dismiss a detailed and particularized report in favor of a cursory report supporting its position. *See* 609 F.3d at 140. Instead, Oxford gave thorough consideration to the claim including, among other things: (1) fully considering all of Sasha's proof in connection with the claim; (2) consulting with an independent Board Certified endocrinologist (Dr. O'Connell), who concluded that the use of growth hormone to treat short stature associated with CAH was not medically necessary (R. at 328); (3) consulting, during the first-level administrative appeal, with another physician (Dr. Dembin), who also found that hormone replacement therapy was not medically necessary to treat the condition (*id.* at 143); and (4) consulting, during the second-level administrative appeal, with another physician (Dr. Rose) who similarly concluded that, consistent with the GHRT Guideline, "use of growth hormone in children with congenital adrenal hyperplasia is not of proven efficacy" and "is not considered to be medically necessary" (R. 284-85). Thus, this is a case in which the conflict "should prove less important (perhaps to the vanishing point) [because]

the administrator has taken active steps to reduce potential bias and to promote accuracy." *Glenn*, 554 U.S. at 117.

Accordingly, the Court concludes that the structural conflict of interest is entitled to little weight in this particular case. In any event, even if it is afforded some weight, it is overwhelmingly outweighed by the other factors supporting Oxford's adverse benefits determination, discussed *infra*.

2. Was Oxford's Denial of Benefits Arbitrary and Capricious?

a. GHRT Guideline

Defendant argues that it was not arbitrary and capricious to deny coverage because the Plan specifically excludes coverage for this benefit. For the reasons set forth below, the Court agrees, and no rational factfinder could conclude otherwise.

As noted *supra*, Oxford has promulgated a GHRT Guideline that states that growth hormone therapy is covered under the Plan but that "[t]reatment of [certain] conditions with Growth Hormone Therapy is still considered experimental in nature or investigational," and is therefore "not covered" under the Plan. (R. at 291.) The Guideline specifically lists "other associated conditions associated with retardation of growth such as: . . . Congenital adrenal hyperplasia." (*Id.* at 292.) This guideline is clearly labeled as one of the Plan's policies. (*Id.* at 287.)

Oxford denied coverage in three separate instances, and the December 3, 2010 letter explicitly advised Sasha that the "review was performed utilizing Corporate Policy, PHARMACY 114.17 [the GHRT Guideline]." (*Id.* at 239.) Moreover, the second-level appeal alluded to the rationale behind this guideline, stating that "[g]rowth

hormone is not FDA approved for the treatment of congenital adrenal hyperplasia." (*Id.* at 251.)

An insurance company's denial of benefits is supported by substantial evidence when a plan explicitly bars coverage for that benefit. In *Krauss*, plaintiffs sought reimbursement for the cost of private-duty nursing care following surgery. However, the plan had an "explicit and unambiguous exclusion of 'private or special duty nursing' from coverage." 517 F.3d at 629 (alteration omitted). The Second Circuit held that, even under *de novo* review, the explicit exclusion of private-duty nursing care meant that Oxford had "no obligation to reimburse [plaintiffs] for costs." *Id.*; *see also Jacobs, Jr. v. Guardian Life Ins. Co. of Am.*, 730 F. Supp. 2d 830, 853-54 (N.D. Ill. 2010) (insurance company reasonably denied benefit for treatment when policy explicitly excluded coverage for experimental treatments and multiple independent peer review physician opinions stated that treatment was both experimental and not medically necessary).

Plaintiff makes several arguments in support of his contention that the GHRT Guideline should not be considered, all of which are without merit. First, plaintiff claims that this guideline is "not part of the Plan" (Pl.'s Mem. at 16), because the guideline is "subject to the terms, conditions and limitations of the Member's contract or certificate" which ultimately controls (R. at 287). Such an argument is without merit because the Plan authorizes Oxford to "adopt reasonable policies, procedures, rules and interpretations to promote the orderly and efficient administration of this Certificate with which Members shall comply." (*Id.* at 43.) Plaintiff's retort that this language is limited to the *administration* of the Plan, and cannot be used to adopt policies related to a benefits determination, is unpersuasive. Plaintiff does not cite, and the Court in its independent review cannot find, any case holding that a benefits policy promulgated by a plan administrator pursuant to this language does not become incorporated into a plan. In fact, the Second Circuit held in *Krauss* that this exact language "conferred discretionary authority on Oxford to make benefits determinations" and, thus, restricted the court to review the benefits decision under the arbitrary and capricious standard. 517 F.3d at 622. While not explicitly holding as such, *Krauss* strongly suggests that this discretionary language grants defendant the right to adopt a policy, such as the GHRT Guideline, to assist with benefits determinations.[6]

Plaintiff also argues that the GHRT Guideline states that Oxford may only review out-of-network claims for growth hormone for medical necessity, and, therefore, that Oxford was *required* to approve this in-network claim. (Pl.'s Mem. at 2 n.1.) This argument misconstrues the language of the policy. This GHRT Guideline merely states that "precertification is required for in-network only [and that] [f]or out-of-network services performed in the office, Oxford reserves the right to review for medical necessity." (R. at 287.) Thus, it is apparent to the Court that this language merely reiterates Oxford's right to determine that a benefit is medically necessary even when precertification is not required, and does not remove the general

---

[6] At oral argument, plaintiff's counsel also focused on the language in the header of the GHRT Guideline, which states: "If there is a difference between any policy and the Member's plan or benefits or Certificate of Coverage, the plan of benefits or Certificate of Coverage will govern." (R. at 287.) This language provides no support for plaintiff's position because there is no inconsistency or difference between the Plan and the GHRT Guideline.

9

requirement in the Plan that all benefits must be medically necessary.[7]

Accordingly, because the Plan grants Oxford the discretion to adopt policies regarding benefits determinations, and because Oxford promulgated a policy that explicitly excludes coverage for growth hormone therapy to treat CAH and other conditions associated with the retardation of growth, it was not arbitrary and capricious for Oxford to deny benefits upon this ground.

### b. Medically Necessary

Even assuming *arguendo* that the Plan did not allow Oxford to adopt the GHRT Guideline, or that Oxford did not actually rely upon this guideline due to its failure to reference it in two of the three denial letters to Sasha, the Court still finds that it was not arbitrary and capricious for Oxford to deny coverage.

"Where 'medical necessity' is a prerequisite for entitlement to a benefit under an ERISA plan, the burden of proof will generally be on the plan participant."

---

[7] Although it is true that under the *contra proferentem* rule "ambiguities in the language of an insurance policy that is part of an ERISA plan [] are to be construed against the insurer," *Critchlow v. First UNUM Life Ins. Co. of Am.*, 378 F.3d 246, 256 (2d Cir. 2004), such a rule is "inapplicable" when reviewing an administrator's decision under the arbitrary and capricious standard, *Pagan v. NYNEX Pension Plan*, 52 F.3d 438, 443-44 (2d Cir. 1995). Moreover, the *contra proferentem* rule is not triggered "unless this court first determines that the contract is, in fact, ambiguous." *Hugo Boss Fashions v. Fed. Ins. Co.*, 252 F.3d 608, 616 (2d Cir. 2001). Therefore, because the Court does not find the language to be ambiguous, and even if the language were ambiguous it would be construed in defendant's favor in this particular case, the Court rejects plaintiff's interpretation of this provision.

*Mario v. P & C Food Markets, Inc.*, 313 F.3d 758, 765 (2d Cir. 2002). Moreover, not only does plaintiff bear the burden of proof, but as stated *supra*, the scope of judicial review under the arbitrary and capricious standard is quite narrow and this Court may not "substitute [its] judgment for that of the plan administrator." *Greenberg*, 2006 WL 842395, at *8 (citation and internal quotation marks omitted).

According to the three denial letters sent to Sasha, Oxford determined that the benefit was not medically necessary. The initial denial stated that "[t]he use of Luptron [sic] in conjunction with Growth Hormone not associated with a medical condition (such as Growth Hormone deficiency) for the purposes of increasing height is not considered medically necessary and therefore, not covered." (R. at 234.) As a threshold matter, plaintiff suggests that this denial incorrectly focuses upon the use of Lupron, rather than growth hormone treatment. Although the phrasing of the denial could be somewhat ambiguous in isolation, it is abundantly clear that the denial dealt with growth hormone given that Sasha was already taking Lupron and Dr. Wallach's request was not for Lupron, but for "Growth Hormone Treatment." (R. at 323.) In other words, the medical necessity of Lupron has never been in issue and was not an issue that Dr. O'Connell was asked to address. Instead, the opinion was addressing whether GHRT – in conjunction with Lupron to increase height – was "medically necessary." Thus, the denial certainly related to the use of GHRT, not Lupron. In addition, the two explanations provided during the appeals phase are further instructive. The first-level appeal held that "the use of growth hormone in children with congenital adrenal hyperplasia is not of proven efficacy." (*Id.* at 239.) In addition, the second-level appeal stated that this treatment

was not FDA approved to treat CAH, and "[i]ts use in this setting has not been shown to be effective." (*Id.* at 251.) Although only one of these appellate determinations mentions the lack of FDA approval for treating CAH, they both state that growth hormone treatment has not been proven to effectively treat CAH.

Plaintiff argues that Oxford's denial was arbitrary and capricious because Dr. Wallach requested growth hormone to treat "short stature," not CAH. Plaintiff is correct in noting that Dr. Wallach listed Sasha's primary diagnosis as "short stature" on the form requesting authorization for the treatment. (*Id.* at 299.) However, all of Sasha's other medical records list him as suffering from CAH without mentioning "short stature." (*See, e.g.*, R. at 301 (stating that Sasha was diagnosed with "NC-CAH" in May of 2009 and not listing a diagnosis of short stature).) Even Dr. Wallach's letter to Oxford requesting second-level appeal reiterated Sasha's diagnosis of CAH and failed to state anything regarding an independent diagnosis of short stature. Dr. Wallach's medical records are consistent with the claim submitted by Sasha's father, which listed the diagnosis as CAH. (R. at 227.) In fact, plaintiff's complaint alleges that the short stature resulted from CAH. (*See* Compl. ¶ 16 ("As a result of Sasha Stern's short stature (resulting from the accelerated bone growth and growth plate closure resulting from CAH), Dr. Wallach prescribed Omnitrope, a form of growth hormone.").)

Accordingly, it was not arbitrary and capricious for Oxford to conclude that Dr. Wallach diagnosed Sasha with CAH and that the short stature was merely an effect of that condition, and, thus, that Dr. Wallach intended to use the growth hormone therapy to treat Sasha's CAH. Therefore, this case boils down to a dispute between Dr. Wallach, who affirmed that this treatment was medically necessary to treat Sasha's likely shorter adult height as a result of CAH, and Oxford's reviewing doctors, who concluded that this treatment was not medically necessary because it is not of proven efficacy.

Oxford has submitted substantial evidence supporting its determination. First, Dr. O'Connell, an independent peer review physician consultant (Board Certified in endocrinology), concluded that GHRT is not medically necessary where there is no diagnosis of growth hormone deficiency. Second, three Oxford Medical Directors – Dr. Dembin, Dr. Rose, and Dr. Wilder – reached the same conclusion. (R. at 143, 146, 284.) That conclusion was further supported by the fact that growth hormone is not FDA approved for the treatment of CAH. Although plaintiff criticizes the brevity of these conclusions, Oxford was not required to provide extensive detail as to why it chose the opinions of its doctors over Dr. Wallach. The explanations provided by Oxford, after its doctors reviewed plaintiff's medical evidence, were more than sufficient to demonstrate that its decision was not arbitrary and capricious. *See Demirovic v. Bldg. Serv. 32 B-J Pension Fund*, 467 F.3d 208, 212 (2d Cir. 2006) (stating in dicta that when the "record shows that the Fund's Appeals Committee had all of [plaintiff's] medical evidence before it, and reviewed it[,] [i]t was within the Fund's discretion to credit the opinions of [their physicians] over those of [plaintiff's] own physicians, and, under the circumstances of [that] case, . . . the Fund was [not] required to offer any further explanation of its decision to do so"); *Suarato v. Bldg. Servs. 32BJ Pension Fund*, 554 F. Supp. 2d 399, 422 (S.D.N.Y. 2008) (holding that Funds' decision was not arbitrary and capricious even when it merely "briefly" explained that it credited its own

11

physicians over plaintiff's treating physicians after reviewing all of the medical evidence).

Moreover, plaintiff has failed to introduce any evidence to refute the findings of the doctors employed by Oxford.[8] In her letter requesting second-level review, Dr. Wallach stated that she did not "want to compromise [Sasha's] adult height," but failed to provide any citations to medical studies or other information to refute Oxford's determination that this treatment was not of proven efficacy for CAH.[9] It is well settled that the fact that Sasha's treating physician recommended a particular treatment does not suggest that Oxford's decision was arbitrary and capricious. *See Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 834 (2003) ("Plan administrators, of course, may not arbitrarily refuse to credit a claimant's reliable evidence, including the opinions of a treating physician. But, we hold, courts have no warrant to require administrators automatically to accord special weight to the opinions of a claimant's physician."). Oxford was entitled to rely on the opinions of its reviewing physicians, all of whom concluded that this treatment was not medically necessary. *See Suarato*, 554 F. Supp. 2d at 420 (collecting cases and holding that "the Trustees acted within their rights in adopting [their 'independent' medical examiners'] evaluations over the directly conflicting opinions of [plaintiff's] treating physicians").

Plaintiff's contention that defendant's explanations are inconsistent is similarly without merit. This is simply not a case in which there are any inconsistencies in the administrator's explanations that could suggest an improper denial of benefits. Although each of Oxford's explanation added some level of detail that was absent in the previous decision, none of the explanations actually contradict one another. *C.f. Scalamandre v. Oxford Health Plans (N.Y.), Inc.*, 823 F. Supp. 1050, 1061 (E.D.N.Y. 1993) (holding after a bench trial that defendant improperly denied coverage because, *inter alia*, it offered contradictory explanations for its determination).[10]

---

[8] As a threshold matter, the Court notes that Dr. Wallach predicted that Sasha would be within the range of normal adult height, but nonetheless concluded that this therapy was medically necessary to avoid Sasha being significantly shorter than expected based upon his parents' above-average height. (*See* R. at 271.)

[9] Both parties attempt to introduce evidence outside of the administrative record in support of their positions. For example, defendant cites to medical studies which apparently confirm its doctors' representations that growth hormone therapy has not been approved by the FDA for the treatment of CAH. (*See* Def.'s Mem. at 16.) Plaintiff requests the Court to look outside the administrative record, but then fails to point to specific citations that would bolster his argument. (*See* Pl.'s Mem. at 13.) "Generally, a court's review of an ERISA claim under the arbitrary and capricious standard is limited to evidence in the administrative record, but the court does have discretion to admit evidence outside the record upon a showing of 'good cause.'" *Puri v. Hartford Life & Accident Ins. Co.*, 784 F. Supp. 2d 103, 105 (D. Conn. 2011) (quoting *Krauss*, 517 F.3d at 631). The Court finds that neither party has demonstrated good cause for this Court to consider evidence outside of the record, and, in any event, neither party has pointed the Court to any documents outside of the record that would affect the outcome of this case.

[10] Plaintiff mistakenly argues that the initial explanation rendered by Dr. O'Connell is inconsistent because it only discusses the administration of the medication Lupron, which Sasha was already taking. Dr. O'Connell stated: "[t]he use of Luptron [sic] in conjunction with Growth Hormone not associated with a medical condition (such as Growth Hormone deficiency) for the purposes of increasing height is not considered medically necessary . . . ." (R. at 234.) As noted *supra*, when considered in the context of Dr. Wallach's request and the fact that Sasha was already taking Lupron, it is clear that Dr. O'Connell's opinion is addressing the addition of growth hormone to Sasha's continuing treatment of Lupron, and does

In addition, plaintiff repeatedly insists that the Plan explicitly guarantees this benefit because the Prescription Drug Rider states that "the cost of Medically Necessary Prescription Drug Products will be Covered at a Network Pharmacy." (R. at 104.) However, plaintiff has failed to explain why the plain reading of the Prescription Drug Rider should not be followed, which only states that medications that are *medically necessary* will be covered. Plaintiff's interpretation of the Prescription Drug Rider to allow growth hormone therapy to be obtained for any reason – even if Oxford determines that the treatment is not medically necessary – would render the medically necessary phrase in the Prescription Drug Rider and the medically necessary clause of the Plan as a whole superfluous; therefore, such an interpretation must be rejected. *See Danouvong ex rel. Estate of Danouvong v. Life Ins. Co. of N. Am.*, 659 F. Supp. 2d 318, 323-24 (D. Conn. 2009) ("[R]ules of contract law apply to ERISA plans, and the law of contract interpretation militates against interpreting a contract in a way that renders a provision superfluous or meaningless." (internal alteration, citations, and quotation marks omitted)); *Bacquie v. Liberty Mut. Ins. Co.*, 435 F. Supp. 2d 318, 327 (S.D.N.Y. 2006) (stating that "courts [must] review ERISA plans within the context of the entire agreement, giving terms their plain meanings," and "an ambiguity [may not] be found where the contract has a definite meaning, and where no reasonable basis exists for a difference of opinion about that meaning" (citations, internal quotation marks, and alterations omitted)), *aff'd*, 247 F. App'x 296 (2d Cir. 2007).

---

not suggest (as plaintiff argues) that Dr. O'Connell believed she was being asked to determine whether Lupron is medically necessary.

Plaintiff also claims that procedural irregularities in the handling of Sasha's claim demonstrate that Oxford's decision was arbitrary and capricious. Although it is true that "procedural irregularities in the administrative process also constitute factors that should be taken into consideration in determining whether a plan administrator abused its discretion in denying a claimant's claim for benefits under the ERISA plan," *Diamond v. Reliance Standard Life Ins.*, 672 F. Supp. 2d 530, 535 (S.D.N.Y. 2009), plaintiff has not identified any actionable irregularities here. The three irregularities plaintiff has identified in his papers – Oxford's use of the GHRT Guideline that he alleges is not part of the Plan, Oxford's failure to address the diagnosis of short stature, and Oxford's refusal to provide the benefits guaranteed by the Prescription Drug Rider – have all been refuted by this Court. No rational factfinder could find that these actions were procedural irregularities that should weigh in plaintiff's favor. *See Lopes v. First Unum Life Ins. Co.*, 09-CV-2642, 2011 WL 1239899, at *9 (E.D.N.Y. Mar. 30, 2011) ("Plaintiff has not identified, and the Court has not found, any of the procedural irregularities, for example, conflicting explanations, lost files, or undocumented decisions, that courts have used to find an abuse of discretion.").

In sum, the only factor weighing in plaintiff's favor is that Oxford had a structural conflict of interest in that every claim that it denies results in higher profits. However, there is no evidence in the handling of Sasha's claim that even suggests that the conflict may have affected its determination. To the contrary, there was substantial evidence in the administrative record, including the GHRT Guideline and the opinions of four physicians, including a Board Certified endocrinologist, that supported defendant's determination. Given this record, no rational factfinder could

13

conclude that Oxford's denial – based upon its determination that growth hormone therapy for Sasha was not medically necessary – was arbitrary and capricious.[11]

3. Did Oxford Breach its Fiduciary Duty to Sasha?

Plaintiff also brings a claim for injunctive and other equitable relief under Section 502(a)(3) of ERISA, arguing that Oxford breached its fiduciary duty to Sasha. Section 502(a)(3) allows for a plan beneficiary to bring an action "to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of this subchapter or the terms of the plan." 29 U.S.C. § 1132(a)(3).

"[W]here Congress elsewhere provided adequate relief for a beneficiary's injury, there will likely be no need for further equitable relief, [because] such relief normally would not be 'appropriate.'" *Varity Corp. v. Howe*, 516 U.S. 489, 515 (1996). Thus, a plaintiff may assert a claim for breach of fiduciary duty under Section 502(a)(3) only when she "has no remedy under another section of ERISA." *Devlin v. Empire Blue Cross & Blue Shield*, 274 F.3d 76, 89 (2d Cir. 2001). However, in this case, because plaintiff's Section 502(a)(3) claim is "entirely duplicative" of his Section 502(a)(1)(B) claim and could be "adequately [] addressed by the relief available under Section 502(a)(1)(B)," summary judgment is also granted to defendant on this claim. *Biomed Pharm., Inc. v. Oxford Health Plans (N.Y.), Inc.*, 775 F. Supp. 2d 730, 737 (S.D.N.Y. 2011).[12]

---

[11] Plaintiff also alleges that Sasha did not receive a full and fair review as required by ERISA, *see* 29 C.F.R. § 2560.503–1(h), because Oxford did not contact Dr. Wallach to clarify her opinions. This argument is without merit because an administrator is not required to contact a treating physician. *See Metzger v. UNUM Life Ins. Co. of Am.*, 476 F.3d 1161, 1166 (10th Cir. 2007) (holding that administrator was not required to contact treating physician so that he could rebut the reports of the administrator's reviewing doctors, and stating that "[p]ermitting a claimant to receive and rebut medical opinion reports generated in the course of an administrative appeal – even when those reports contain no new factual information and deny benefits on the same basis as the initial decision – would set up an unnecessary cycle of submission, review, re-submission, and re-review"); *see also Young v. Hartford Life & Acc. Ins. Co.*, 506 F. App'x 27, 28 (2d Cir. 2012) (rejecting argument that plaintiff did not receive a full and fair review when administrator failed to "obtain readily available documents before denying her appeal," and stating that "[w]e have never saddled an insurer . . . with [such an] obligation"). Moreover, there was no reason for Oxford to contact Dr. Wallach because it had all of the medical evidence available to it. In any event, as discussed *supra*, Dr. Wallach did contact Oxford after the treatment was denied and reiterated her belief that the medication was medically necessary.

[12] Even assuming *arguendo* that a claim for equitable relief was "appropriate" in this case, such a claim cannot survive summary judgment for the same reasons as the Section 502(a)(1)(B) claim. Because it was not arbitrary and capricious for Oxford to deny Sasha's claim for benefits, and because Oxford reasonably interpreted the terms of the Plan, defendant must also be awarded summary judgment on plaintiff's Section 502(a)(3) claim. *See Rau v. Hartford Life & Accident Ins. Co.*, 11-CV-1772, 2013 WL 1985305, at *7 (D. Conn. May 13, 2013) (granting summary judgment to defendant on plaintiff's breach of fiduciary duty claim when Court had already concluded that defendant had not acted unreasonably in interpreting the plan at issue and denying claim for benefits).

IV. Conclusion

For the foregoing reasons, the Court grants defendant's motion for summary judgment as to all claims in their entirety, and denies plaintiff's cross-motion for summary judgment. The Clerk of the Court is directed to enter judgment accordingly and close the case.

SO ORDERED.

_____
JOSEPH F. BIANCO
United States District Judge

Dated: July 17, 2013
Central Islip, NY

\* \* \*

Plaintiff is represented by Mark R. Osherow and Kenyetta N. Alexander, Buckingham Doolittle & Burroughs, LLP, 5355 Town Center Road, Suite 900, Boca Raton, FL 33486. Defendant is represented by Michael H. Bernstein and John T. Seybert, Sedgwick LLP, 225 Liberty Street, New York, NY 10281.